683 So.2d 218 (1996)
STATE of Louisiana
v.
Lawson Eugene STRICKLAND.
No. 94-KA-0025.
Supreme Court of Louisiana.
November 1, 1996.
Rehearing Denied December 13, 1996.
*222 Gary Patrick Clements, Blaine Gerard LeCesne, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, William E. Tilley, District Attorney, Ted R. Broyles, II, Leesville, Michelle W. Ghetti, Baton Rouge, for Respondent.
WATSON, Justice.[1]
A Vernon Parish grand jury indicted Lawson Eugene Strickland and Christian Boyd for first degree murder, armed robbery and conspiracy to commit the armed robbery of Jesse B. Pinsonneault. The indictment was amended prior to trial to charge only Strickland. A jury found Strickland guilty as charged on all counts. After a penalty hearing, the jury unanimously recommended a death sentence for the first degree murder, finding as an aggravating factor that the murder was committed during the commission of an armed robbery. The trial judge sentenced Strickland to death in accordance with the jury's recommendation. This is the direct appeal of his conviction for first degree murder and death sentence.[2] La. Const.1974, art. V, § 5(D).
On appeal, Strickland relies on eight unargued assignments of error noted by his trial counsel and 17 argued errors assigned by appellate counsel. All errors will be reviewed in this capital case. State v. Bourque, 622 So.2d 198, 208 n. 1 (La.1993). We affirm the conviction and conditionally affirm the sentence, remanding the matter to the trial court for the development of additional facts relative to the appropriate penalty.

FACTS
At 1:35 a.m. on November 3, 1992, the Vernon Parish Sheriff's Office responded to a report of robbery and shooting at the Merchants and Farmers Bank on Fort Polk Entrance Road southeast of Leesville, Louisiana. Officers dispatched to the scene saw Jesse Pinsonneault, the 23-year old assistant manager of a nearby Sambino's pizza restaurant, lying in a pool of blood. Pinsonneault had been shot once in the upper right chest; a spent .380 cartridge casing lay nearby. The victim told officers he had come to put the day's receipts into the bank's night deposit when a man approached him from behind and said something to him. Pinsonneault turned toward the man, saying "What?" and was shot in the chest. The man then grabbed one of the two bank bags the victim carried, which contained $106.91 in cash and checks, and ran away.
Pinsonneault described his assailant as a white male, five feet eight inches to five feet nine inches tall, wearing dark clothing. Pinsonneault was rushed to a nearby hospital for treatment and then transferred to Rapides General Hospital in Alexandria, Louisiana. He died later that morning of his injuries.
Officers interviewed Donald Baker and Rogena Cravens. Baker, Pinsonneault's friend, had waited at Sambino's while Pinsonneault made out the night deposit. Cravens, a Sambino's employee, had cleaned up for the night. Baker and Cravens waited in front of Sambino's while Pinsonneault drove approximately 300 yards to make the night bank deposit.
Baker heard voices coming from the direction of the bank, then he and Cravens heard a gunshot and someone yelling for help. Baker told Cravens to get into his car, then ran toward the bank. Baker saw a man on a nearby hill run back toward the woods. Cravens saw another man dressed in black running across a parking lot 100 feet away toward the woods and heard heavy footsteps. Baker did not see the second man but heard his heavy running footsteps.
Baker found Pinsonneault lying on his back, bleeding from a gunshot wound. Pinsonneault told Baker his assailant was approximately *223 Baker's build (5'10", 175 lbs). Baker ran across the street to a Shop Rite store, had them call an ambulance and ran back to Pinsonneault's side.
The police brought in tracking dogs which followed a trail through the woods. The scent was lost in a nearby military housing area beyond the woods. Officers canvassed the area without success.
On November 6, 1992 at 3:55 p.m., Dispatcher Lonnie Barrington of the Vernon Parish Sheriff's Office received a call from an anonymous male, stating that two escapees from the parish jail, Lawson Strickland and Christian Boyd, were staying with two girls named Amy and Jennifer in a trailer on Jeane Chapel Road. The caller gave directions to the trailer and warned that both men were armed and dangerous. Strickland and Boyd, facing burglary and theft charges, had escaped from the parish jail on October 28, 1992.
Police went to the described area. A young woman exited the trailer and was followed to her parents' residence in Leesville. The woman was Kimberly Atkins, known to the police as Lawson Strickland's girlfriend. When stopped, Atkins told police that Strickland and Boyd were not in the trailer she had just left and that she did not know where they might be. Police transported her back to the trailer, where she continued to insist that the men were not inside.
Police officers knocked on the trailer's front door; Amanda "Amy" Dempsey opened it. When officers asked if there were other people in the trailer, she stated that there were and called to the persons inside. Dempsey, Strickland and Boyd walked outside to the waiting officers, were placed on the ground and handcuffed. Jennifer McCormic, the trailer's lessee, was picked up from her job and escorted back to the trailer where she signed a consent to search form.
Police seized clothing worn by Strickland and Boyd, including two pairs of muddy boots found outside the trailer door, a box of.380 ammunition found in a kitchen drawer, loose .380 ammunition found under the bed in the master bedroom and pieces of a cut-up shirt which Strickland and Boyd had worn tied on their heads. Strickland and Boyd were arrested on simple escape warrants.
The three women were escorted to the sheriff's office for questioning as suspects for harboring escapees. All three were read their rights and signed waiver forms. Jennifer McCormic and Amanda Dempsey told officers the following information: the two women lived in the trailer. Kimberly Atkins, a friend, stayed there at times and had a key. On October 29, 1992, McCormic and Dempsey returned home from work to find that Atkins had brought Strickland and Boyd. Atkins asked if the men could stay there for awhile and McCormic and Dempsey consented. Atkins stayed there, too, living with Strickland in the master bedroom.
Strickland and Boyd told the women they needed to leave town and needed money. Atkins stole a .380 automatic pistol from her brother and gave it to Strickland and Boyd. Both men frequently carried the weapon in and out of the trailer.
McCormic and Dempsey returned from work at approximately 2 a.m. on November 3, 1992. They left the trailer but returned again between 4 and 4:30 a.m. to find muddy boots by the trailer door. Inside, Strickland was pacing around the living room with the gun in his hand. His forearms were scratched and bleeding. Boyd sat on the couch saying nothing. Strickland told the women he had shot a man making a Sambino's deposit. He had then grabbed the man's money bag and ran. Boyd had acted as lookout from a nearby hill. Strickland slipped down the slope, scratching his arms. The men ran through the woods. Hearing dogs, they ran through mud and water. Strickland hoped the man he shot in the face would not be able to identify him. The men had worn cut-up pieces of a shirt tied on their heads to avoid identification.
Dempsey and McCormic told officers the gun was normally kept on the headboard in the master bedroom where Strickland slept. Dempsey stated Strickland told her to hide the gun when the officers came to the trailer. Both women had seen the money bag at the trailer; there had been approximately $60 in cash and several checks. McCormic told officers *224 she knew where the money bag could be found.
After hearing this information, officers accompanied McCormic back to the trailer. She directed them to a trash bin 100-150 yards from the trailer where the money bag was found containing checks, deposit slips and adding machine tape dated November 2, 1992. Strickland and Boyd were arrested for first degree murder, armed robbery and conspiracy to commit armed robbery. Dempsey and McCormic were arrested as material witnesses; charges were later dismissed against them.
Kimberly Atkins was also arrested and later pleaded guilty to accessory after the fact of first degree murder. At trial, she confirmed that she brought Strickland and Boyd to the trailer and that she stole a pistol from her brother and gave it to Strickland and Boyd. She had taken the men to Toledo Bend so they could practice firing the pistol. In the late evening of November 1, 1992, she took the men to a ballfield near the bank. They told her they wanted to watch persons making night deposits so they could learn their patterns. They had the gun with them; their plan was to take their victim's money and, if there were a struggle, to knock the victim over the head with the gun.
The next evening, on November 2, 1996, Atkins again dropped Strickland and Boyd off near the bank. The men were dressed in dark clothes with cut-up shirt pieces tied on their heads; they had the gun. She next saw the men at 3 or 4 a.m. Both were extremely dirty, muddy and wet. Strickland had scratches on his forearms and told her he had just shot a man during a robbery.
The defense called no witnesses during the guilt phase of the trial. The jury returned unanimous verdicts of guilty of first degree murder, armed robbery and conspiracy to commit armed robbery.
During the penalty phase on the first degree murder conviction, the state reintroduced all evidence presented in the guilt phase of trial. The defense presented the testimony of Strickland's mother and stepfather. No opening or closing statements were made on Strickland's behalf. The jury unanimously recommended the death penalty, finding as a statutory aggravating factor that the murder of Jesse Pinsonneault was committed during the commission of an armed robbery.

LAW AND DISCUSSION
In a "Prefatory Statement," the defendant attacks that part of this Court's ruling in State v. Taylor, 93-2201, p. 4-7 (La. 2/28/96), 669 So.2d 364, 367-369, petition for cert. filed, in which it announced a restricted capital case scope of review. Taylor returned this Court's capital case scope of review to "alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not." Id., at p. 7, 669 So.2d at 369. This Court has declined to revisit its ruling in Taylor and will not do so here. See State v. Mitchell, 94-2078 (La. 5/21/96), p. 5 n. 3, 674 So.2d 250, 254, petition for cert. filed, and State v. Sepulvado, 93-2692 (La. 4/8/96), p. 3, 672 So.2d 158, 162, petition for cert. filed.

PRETRIAL ISSUES

Denial of Motion to Quash
Defendant argues that the district court erred in denying a motion to quash the indictment. In the motion, defendant claimed the indictment charging him with conspiracy to commit armed robbery, armed robbery and first degree murder was "duplicitous or contain[ed] a misjoinder of offenses." Vol. I, p. 37. At a pretrial motion hearing, defense trial counsel argued duplicitous and double jeopardy aspects were presented by the joined offenses. Vol. 2, p. 346-358. Characterizing the defense argument as one of double jeopardy, the trial court denied the motion to quash. Vol. 3, p. 607-608. On the morning of trial, defense trial counsel renewed argument on the motion to quash, raising only claims of duplicitousness and double jeopardy. The trial court again denied the motion to quash. Vol. 4, p. 877-879.
The motion to quash the indictment had merit, but not for the reasons argued by defense trial counsel. The charges constituted *225 a misjoinder of offenses under La.C.Cr.P. art. 493. La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial. (Emphasis supplied)
State v. McZeal, 352 So.2d 592, 601 (La. 1977) (on reh'g) interpreted this article's provision that joined offenses be triable by the "same mode of trial" as a reference to La. Const. art. 1, § 17, which
suggests four classes of [criminal] trials: trial before a judge only; trial before a jury of six persons, five of whom must concur to render a verdict; trial before a jury of twelve persons, ten of whom must concur to render a verdict; and trial before a jury of twelve persons, all of whom must concur to render a verdict.
See also La.C.Cr.P. art. 782(A). All the charges against Strickland required trial before a jury of twelve persons. However, the capital charge required a unanimous verdict; the non-capital charges required the concurrence of only ten jurors. Thus, under McZeal the joinder of capital and non-capital charges in a single indictment violated the terms of art. 493 and La. Const. art. I, § 17.
The state argues this issue has not been preserved for review. The state maintains that simply tracking the language of La. C.Cr.P. art. 532(3) in the motion, alleging the indictment is "duplicitous or contains a misjoinder of defendants or offenses," is not sufficient to put the court or state on notice of the complained-of error, particularly when the argument of counsel focused on duplicitous and double jeopardy considerations. State's Brief at 18. Indeed, a motion to quash must "specify distinctly the grounds on which it is based." La.C.Cr.P. art. 536.
Appellate defense counsel recognizes this obstacle and focuses his argument on the misjoinder ground raised only in the written motion. Defense Brief, at 15, n. 18. Under the Taylor scope of review, if the Court finds trial counsel did not sufficiently specify this error prior to trial, the Court need not review this issue. The facts present a close case. However, in order to reach a more significant question, the Court will assume, without deciding, that the defendant's objection had enough specificity to preserve the matter for review.
Under McZeal, the joinder of capital and non-capital charges in a single indictment violates the terms of La.C.Cr.P. art. 493 and La. Const. art. 1, § 17. Having found misjoinder, the Court must now determine the proper appellate analysis of the error.
McZeal held misjoinder of offenses was prejudicial per se and rejected harmless error review. To reach this conclusion, McZeal relied upon the distinction between misjoinder of offenses and prejudicial joinder.
Under the Code of Criminal Procedure, when offenses are not properly joinable under Article 493, the defendant has a right to have the indictment quashed. La. C.Cr.P. art. 493. In contrast, if the offenses are joinable, but the joinder is prejudicial, a defendant is only entitled to seek a severance, which shall be granted before trial "if it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." La.C.Cr.P. art. 495.1(a). McZeal, 352 So.2d at 602.
McZeal found that La.C.Cr.P. art. 493 had a "built-in standard of prejudice," and that any improper joinder was "conclusively presumed to be prejudicial or harmful." Id. at 602-603.
In addition to this distinction, McZeal noted the provisions of La.C.Cr.P. art. 493 substantially tracked the language of Federal Rule of Criminal Procedure 8(a). McZeal found, however, that the concluding proviso of La.C.Cr.P. art. 493, which makes joinder contingent upon the joined offenses being subject to the same mode of trial, "evinces an affirmative intent on the part of the legislature to limit the application of the joinder provision to a narrower class of cases than those provided for in the federal system." *226 Id., 352 So.2d at 600. Nevertheless, McZeal relied on federal authorities interpreting Federal Rule of Criminal Procedure 8(a), to find that, just as a federal trial judge has no discretion to deny relief after finding misjoined offenses, neither does a state appellate court have discretion to do other than reverse an erroneously sustained joinder. Id. at 603.
We reject McZeal's conclusion that misjoinder constitutes prejudice per se which mandates automatic reversal of a conviction and sentence, and hold that misjoinder may be reviewed for harmless error.
The distinction between misjoinder and prejudicial joinder is an important one, but only at the trial level to determine whether a defendant's proper remedy is a motion to quash or a motion to sever. At the appellate level, the distinction becomes blurred since the basis for the prohibition against both misjoinder and prejudicial joinder is, essentially, prejudice to the defendant. See State v. Mallett, 357 So.2d 1105, 1109 (La.1978), cert. denied, 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979) ("The prohibition against misjoinder of offenses and improper consolidation of offenses for trial is grounded on the possible prejudice arising from a single trial on two or more offenses.") (emphasis added). Thus, errors of both types may be reviewed to determine whether the substantial rights of the defendant were prejudiced. A judgment or ruling should not be reversed due to error unless the error affects substantial rights of the accused. La. C.Cr.P. art. 921, see also State v. Johnson, 94-1379, p. 16 (La. 11/27/95); 664 So.2d 94, 101 (rule for trial procedure couched in mandatory terms rejected as per se rule for appellate review).
This conclusion is bolstered by federal authority. Subsequent to McZeal, the federal courts have determined that misjoinder under Rule 8, Federal Rules of Criminal Procedure, is subject to harmless-error analysis and is not reversible error per se. See United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).
In Lane, the Court was faced specifically with misjoinder under Rule 8(b) [misjoinder of defendants; Rule 8(a) deals with misjoinder of offenses], but stated that it "granted certiorari to resolve ... whether a misjoinder under Rule 8 ... is subject to the harmless error rule." The Court referred throughout the opinion to Rule 8, rather than merely Rule 8(b), and evidently intended for the doctrine of harmless error to be applied to misjoinder under Rule 8(a) as well.
8 Moore's Federal Practice § 8.04[2], p. 8-16.
The only question remaining is whether the misjoinder which occurred in this case was harmless error or whether it prejudiced the defendant's substantial rights. The trial court concisely instructed the jury as to the three charges brought against Strickland. After stating what the charges were, the trial judge instructed:
There is no particular order in which you are required to consider each of those three counts. The jury is entitled to determine for itself the manner of its deliberation and the order in which it considers these respective counts. I shall instruct the ladies and gentlemen of the jury, however, that it is your duty to consider these counts separately and independently so that your determination as to the guilt or innocence of the accused relative to one count should not necessarily require you to decide in the same manner on another count. You are further advised that the grand jury is merely an accusatory body and the return of an indictment does not create any presumption of guilt on the part of the accused.
Vol. 2, p. 297-298. The trial judge then instructed the jury on the elements of the crimes charged.
During deliberations, the jury foreman sent questions for the trial judge including whether the jurors could have a copy of the instructions. Vol. 2, p. 307. The trial judge called the jurors back into the courtroom and told them they could not have a copy of the instructions. Vol. 7, p. 1611.
The trial judge correctly refused to give the jurors a copy of the written jury instructions. See La.C.Cr.P. art. 801 (Official Revision Comment D) ("This article does not *227 authorize the jury to take with them a copy of the judge's written charges when they retire to deliberate."); State v. Yoxtheimer, 301 So.2d 318, 320 (La.1974) (trial court did not err in refusing jury written instructions); but see State v. Stracner, 190 La. 457, 182 So. 571 (1938) (judge may allow jury to view written instructions during deliberations); State v. Campbell, 173 La. 831, 138 So. 853 (1932) (same); State v. Riggio, 124 La. 614, 50 So. 600 (1909) (same). Even if this ruling had been error, the jury foreman then informed the trial court that the jury did not really need the instructions. "At the present time, we don't need anything. We just wanted those questions answered." Vol. 7, p. 1612. The jury posed no more questions, deliberated and returned with a verdict.
The record does not indicate that the jury was confused about the three charges brought against the defendant. The state did not introduce any evidence on the non-capital charges which would not have been admissible at trial of the capital charge alone. Strickland was not precluded from presenting any type of defense by the joinder of the charges. The Court finds that the misjoinder in this case was harmless error and did not prejudice Strickland's substantial rights as to the capital charge.
In fact, the only possible prejudice to Strickland does not involve the capital charge at all. Since Strickland was found guilty of first degree murder and was sentenced to death, he has a right of direct appeal to this Court. La. Const. art. V, § 5(D). The briefs and assignments of error to this Court concern only his capital conviction and sentence. Perhaps due to the more serious consequences of the capital conviction and sentence, Strickland's trial counsel did not preserve his appeal rights as to his conviction and sentence for conspiracy to commit armed robbery. Should Strickland desire to appeal his conspiracy conviction and sentence, however, he may file a motion for an out of time appeal in the district court. See State v. Counterman, 475 So.2d 336 (La.1985).
Although the district court erred in failing to grant Strickland's motion to quash the indictment for misjoinder of offenses, this Court finds the error harmless.

Denial of Motions to Suppress
Defense trial counsel filed two pretrial motions to suppress. The first motion generally sought suppression of evidence seized at the trailer at the time of Strickland's arrest. The second motion sought suppression of the physical evidence seized at the trailer, Strickland's oral statements to McCormic, Dempsey and Atkins, telephone calls Strickland made to Atkins from prison, letters he wrote her and a lab report. Testimony at the first of two suppression hearings showed that, after the sheriff's department received the tip that Strickland and Boyd were in the trailer, armed and dangerous, officers with arrest warrants for the two men (but without a search warrant) surrounded the trailer. Officers at the front of the trailer knocked on the door and Amanda Dempsey opened it. Dempsey, Strickland and Boyd exited the trailer and were handcuffed. Because they heard noises in the trailer, the officers at the front of the trailer entered it. The noise (it was later discovered) came from other officers trying to open the back door. The officers who entered via the front door saw and seized a .380 automatic pistol from the master bedroom, visible upon entry, to prevent its use by anyone else in the trailer. When the officers discovered that no other persons were in the trailer, they replaced the gun, then photographed it. Officers then picked up the trailer's lessee, Jennifer McCormic, who consented to a search of the trailer. The officers recovered several items of physical evidence, including clothing and boots worn by Strickland and Boyd, a box of.380 ammunition from the kitchen, loose .380 shells from the master bedroom, and the gun. Later that night after talking to McCormic and Dempsey, officers returned to the trailer and discovered the bank bag in the garbage bin approximately 100-150 yards away.
At the close of the hearing, the trial judge granted the motion to suppress insofar as it related to the gun itself, finding the officers' expressed reasons for entering the trailer unpersuasive and finding no other justification for it. However, the trial judge otherwise denied the motion and allowed for introduction *228 of the items seized after the officers had consent to search.
Since the first suppression hearing disposed of the physical evidence seized inside the trailer, the second suppression hearing was limited to the bank bag found in the garbage bin and the letters Strickland wrote to Atkins. The second motion to suppress was denied by the trial judge. At trial, the trial judge overruled objections about the letters and related testimony.
By unargued assignments of error, trial counsel claimed that the trial judge erred in denying "defendant's first and second motions to suppress except for the gun." In a related vein, trial counsel also complained of the admission into evidence of the letters written by the defendant.
An unreasonable search and seizure is prohibited by La. Const. art. 1, § 5.
[A] search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent.
State v. Owen, 453 So.2d 1202, 1205-1206 (La.1984) (citations omitted). The officers did not have a search warrant when they searched the trailer, however, the trailer's lessee, Jennifer McCormic, consented to the search.
At the suppression hearing, defense trial counsel argued McCormic's consent was not freely given and was tainted by the officers' initial seizure of the gun. "[I]f the consent was obtained after an illegal ... entry, the consent was valid only if it was the product of a free will and not the result of an exploitation of the previous illegality." Owen, 453 So.2d at 1206.
The "previous illegality" argued by the defense was the officers' initial seizure of the gun. In fact, the trial judge may have erred in defendant's favor when he suppressed the gun, given that the circumstances of its seizure could qualify as exigent circumstances relaxing the warrant requirement. See e.g. Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (officers' concern for safety justifies warrantless seizure of weapon). The state did not seek writs on this matter, that issue is not before us and is unnecessary to a determination of the voluntariness of McCormic's consent.
The record shows McCormic's consent was a product of her free will and was not based on the officers' prior seizure of the gun.
Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that [s]he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstance and, particularly, the purpose and flagrancy of the official misconduct.
Owen, 453 So.2d at 1206. Officers went to McCormic's place of employment and told her Strickland and Boyd had been found in her trailer. She was read her rights and escorted back to the trailer. The officers did not tell McCormic about finding a gun while arresting Strickland and Boyd. When they returned to the trailer, the officers told McCormic she did not have to sign the consent to search form. McCormic testified she felt she had an option not to sign the form. When asked why she signed the form, McCormic replied:
I didn't see any reason not to.... I just signed it because I didn't see why I should not sign it.
Vol. 2, p. 485. Finally, the purpose of the officers' entry into the trailer and seizure of the gun was their fear that other unknown persons might cause them harm. McCormic's consent was voluntarily given. The trial judge thus properly denied the first motion to suppress evidence other than the gun seized from inside the trailer.
The trial judge also properly denied the second motion to suppress. "There is no constitutional prohibition against seizure of abandoned property by the police." State v. Mattheson, 407 So.2d 1150, 1158 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). The *229 bank bag was discovered in the trash bin located near McCormic's trailer. This evidence was clearly abandoned property and subject to seizure without a warrant. As to letters written by Strickland to Atkins both before and after the instant crimes, the record shows Atkins simply presented these letters to investigators. The letters thus fall outside the ambit of constitutional protections. See Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966) (Fourth Amendment does not protect defendant's "misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it"); State v. McCommons, 398 So.2d 1100, 1102 (La.1981) (same).
At trial, defense counsel objected to the letters on the basis of hearsay, relevancy, lack of proper foundation, and because they were "fruit of the poisonous tree". The trial judge overruled the objections. The trial judge had portions of the letters, either too inflammatory or inadmissible as relating to other crimes evidence, deleted from the letters shown to the jury. The letters, as Strickland's own statements, were not hearsay. La.C.E. art. 801(D)(2). The relevancy of the letters, in which Strickland urged Atkins to "stick to the story" and generally wrote about the crimes, is self-evident. Atkins testified about receiving the letters and also receiving telephone calls from Strickland discussing the fact that the letters were written; a proper foundation was laid for the letters' introduction. The letters were not "fruit of the poisonous tree" because no constitutional violations occurred in their procurement. The trial judge did not err in allowing the letters to be introduced in evidence.

Denial of Motion for Continuance
By unargued assignment of error, trial counsel asserted the district judge erred in denying a motion for continuance of the June 14, 1993 trial date. The record shows the trial was originally scheduled for April 12, 1993 and the district judge granted an earlier defense motion for continuance to allow defense counsel time to consider supplemental discovery. Trial was reset for June 14, 1993. Defense counsel filed a second motion for continuance June 11, 1993, alleging surprise and undue prejudice by the state's late disclosure of additional letters written by the defendant (before the crime) and the state's late notice of its intent to introduce the defendant's oral inculpatory statements.
The decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge and a reviewing court will not disturb such a determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Bourque, 622 So.2d 198, 224 (La.1993). Each determination is case-specific. Generally, this Court declines to reverse convictions for improper denial of a continuance motion absent a showing of specific prejudice. Id.; State v. Simpson, 403 So.2d 1214, 1216 (La.1981).
The record shows the state asserted it had provided a copy of every letter it intended to introduce into evidence to the defense. The defendant's letters written before the crime occurred were introduced only to lay a predicate for the authenticity of the letters written after the crime occurred. The defendant's oral statements, which the state referred to in the later discovery supplement, were telephone conversations with Atkins regarding the content of the letters written prior to the crime. This was necessitated by the defendant's refusal to give handwriting exemplars. After these considerations were made known to the trial judge, he denied the motion for continuance remarking:
Well, Counsel, you see, your client refused to submit to the handwriting and give handwriting exemplars. I would not have been surprised if the State had dug back in his past to obtain writings of his to submit to a handwriting expert, as far as that goes.
Vol. 4, p. 890-891.
Once the defendant refused to give handwriting exemplars, defense counsel should have anticipated the state would seek some method for authenticating the letters Strickland wrote Atkins from jail. In this unargued assignment, the defense does not maintain that Strickland did not write the *230 letters or that testing by a defense expert would lay doubt on their authenticity. It is hard to see how the defense could meaningfully have resisted the introduction or countered the impact of this testimony; thus, the defendant can show no prejudice. This Court finds no abuse of trial court discretion in denying the defendant's second motion to continue the trial.

VOIR DIRE ISSUES

Exclusion by Defense of Male Venirepersons
The defendant argues that the trial court erred in allowing defense trial counsel to violate the equal protection rights of prospective male jurors whom the defense struck peremptorily. The defendant argues this action was in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (racially discriminatory exercise of peremptory challenges by the state are unconstitutional); J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extended Batson protection to gender-based discriminatory peremptory challenges) and Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (a criminal defendant's racially discriminatory exercise of peremptory challenges inflicts the harms addressed by Batson). Defendant bases his claim on and extends an analysis advanced in United States v. Huey, 76 F.3d 638 (5th Cir.1996).
In Huey, the federal court of appeals reviewed the conviction of a white defendant whose trial counsel used all five of his peremptory challenges to strike five African-American veniremen. The court found that:
the district court failed to discharge its clear duty either to elicit a race-neutral explanation for the peremptory challenges or deny the use of those challenges [and thereby] committed reversible error in determining implicitly that the equal protection rights of these jurors had not been violated. Such error requires a new trial....
Huey, 76 F.3d at 641. Defendant makes an analogous if weaker showing here, in that defense trial counsel used seven of eight peremptory challenges against men.[3]
As a lower federal court opinion, Huey "can provide no more than persuasive authority in this court, and does not control this court's decisions, because lower federal court decisions do not bind this court's interpretation of federal constitutional law." State v. Sanders, 93-0001, p. 7 (La. 11/30/94), 648 So.2d 1272, 1279, cert. denied, ___ U.S. ___, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); State v. Johnson, 94-1077, p. 11 n. 5 (La. 1/16/96), 667 So.2d 510, 517, n. 5 (same).
Huey fails entirely to persuade, standing as it does for the proposition that a defendant can both violate the constitutional rights of veniremen and the state's right to a fair trial, and subsequently, if acquittal has not put him safely out of reach on double jeopardy grounds, claim error and receive a new trial. A federal circuit court has already rejected Huey's ruling, finding, inter alia, that "[g]iving a defendant a new trial because of his own violation of the Constitution would make a laughingstock of the judicial process." United States v. Boyd, 86 F.3d 719, 725 (7th Cir.1996). The Boyd court also found that the defendant had waived the right to a jury chosen without regard to impermissible characteristics (in his case, race) and so could not complain of jury composition. Id., 86 F.3d at 722. The Boyd court added that the defendant could not complain of ineffective assistance of counsel because he suffered no prejudice under the second prong of the test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Seventh Circuit pointed out that the Huey decision rests on a "non-sequitur" arising out of a misreading of Batson and its progeny: though these cases set up rules which "set limits on peremptory challenges to protect the interests of jurors and the criminal justice system.... it does not follow that by violating these important social interests a defendant can help himself to a new trial." Id., at 724. In this case, the defendant's arguments rely almost entirely on Huey and so suffers from all of its weaknesses.

*231 State Cause Challenges

By unargued assignment of error, defense trial counsel challenged the trial judge's rulings allowing the state's cause challenges. A court may exclude a venireperson for cause based on his death penalty views when those views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citing Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); see also Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); La. C.Cr.P. art. 798(2). A trial judge has great discretion in determining whether cause has been shown to reject a prospective juror; this Court will not reverse this determination unless review of the whole voir dire indicates an abuse of discretion. State v. Bourque, 622 So.2d 198, 226 (La.1993).
The record shows that during the voir dire examinations of five prospective jurors, the prospective jurors indicated they could not return a verdict for capital punishment under any circumstances or were unalterably opposed to the death penalty. Supp. Vol., p. 74; 84-86; 126; 165-66, 169; 192. Each of the challenged venirepersons indicated with sufficient clarity that he or she could not consider a death sentence. There was no abuse of the trial judge's discretion in sustaining the state's cause challenges.

Ineffective assistance of counsel
The defendant argues his trial counsel was constitutionally ineffective due to trial counsel's 1) failure to rehabilitate jurors excused under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1988); 2) failure to educate potential jurors on the actual meaning of mitigation; 3) failure to request individualized sequestered voir dire; and 4) failure to object to the state's leading questions.
Under the standard for ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a reviewing court must reverse a conviction if the defendant establishes that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's inadequate performance prejudiced the defendant to the extent that the trial was rendered unfair and the verdict suspect. A reviewing court must review trial counsel's actions under a "highly deferential" standard of review which eliminates, as far as possible, "the distorting effects of hindsight" and allows the court "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. This Court therefore "does not sit to second-guess strategic and tactical choices made by trial counsel." State v. Myles, 389 So.2d 12, 31 (La.1980).
Generally, claims of counsel ineffectiveness are more properly reviewed in post-conviction applications after an evidentiary hearing. Claims of counsel ineffectiveness are only addressed on direct review if the record discloses sufficient evidence to decide the issue. State v. Mitchell, 94-2078, p. 6 (La. 5/21/96); 674 So.2d 250, 255. A review of the record convinces us that there is sufficient information to consider these claims.
As to appellate counsel's first voir dire claim, this Court has held that failure to traverse a venireperson expressing opposition to the death penalty does not constitute ineffective assistance. State v. Prejean, 379 So.2d 240, 242-243 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). This may be a tactical decision of trial counsel. As expressed in Prejean, "defense counsel apparently chose to forego rehabilitation of the excluded jurors in the hope of impressing upon the remaining jurors the moral scruples some members of society have against imposition of the death penalty." Id. at 243.
The second voir dire claim assigns as error jury questioning which would have impacted the penalty phase only. This opinion remands for evidentiary hearing on the alleged ineffectiveness of counsel relating to the penalty phase. This claim may, therefore, be raised and considered at the ordered hearing.
*232 As to the third voir dire claim, appellate counsel claims the questioning of prospective juror panels within the entire venire's hearing created the "special circumstances" necessary to an individualized, sequestered voir dire. Counsel claims the entire venire was exposed to prejudicial comments and information about the case through prospective juror questioning.
The manner in which voir dire is conducted is left to the trial court's discretion. La.C.Cr.P. art. 784; State v. Bourque, 622 So.2d at 224; State v. Comeaux, 514 So.2d 84, 88 (La.1987). The defendant bears the burden of showing an abuse of that discretion; there is no trial court error where the defendant does not show special circumstances which necessitated individualized, sequestered voir dire. Comeaux, 514 So.2d at 88. "The defendant must show there will be a significant possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material." Bourque, 622 So.2d at 224. A capital trial alone does not present the required special circumstances, nor does an allegedly sensational crime. Id. Examples cited by counsel of possibly prejudicial material which the entire venire is alleged to have overheard shows that the trial court did not allow prospective jurors to disclose facts or details of the case. At the most, the venire heard prospective jurors state they could not be impartial and would not limit their decision-making processes to the evidence heard at trial. This does not rise to the level of "special circumstances" necessitating individualized, sequestered voir dire. The nonsequestered voir dire examination was not an abuse of the trial court's discretion.
As to the fourth voir dire claim, trial counsel's failure to object to leading questions represents a classic tactical choice with which this Court should not interfere. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065; Myles, 389 So.2d at 31.

GUILT PHASE

Reference to Inculpatory Statement in Opening Argument
The defendant argues that the trial court erred in failing to declare a mistrial after the state referred to an alleged inculpatory statement during its opening argument, in violation of La.C.Cr.P. art. 767. The record reflects that during his opening argument, the prosecutor stated:
You will hear [Atkin's] testimony as to when these two men entered the trailer as to what Lawson Strickland told them he had just done.
Vol. 4, p. 849. Defense counsel moved for a mistrial at a bench conference. The trial judge allowed the prosecutor to finish his opening statement and ultimately decided to deny the motion, finding the statement was part of the res gestae of the offense.
At the time of trial, La.C.Cr.P. art. 767 provided:
The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant.
La.Acts 1995, No. 1278 amended the statute by adding "unless the statement has been previously ruled admissible." Even at the time of trial, however, a violation of the rule did not automatically require a mistrial. The purpose of the rule is to "prevent surprise and to allow adequate time for preparation of the defense, as well as to avoid certain problems that had been attendant to mentioning of confessions or inculpatory statements in the state's opening statement." State v. Parker, 436 So.2d 495, 499 (La.1983); State v. Russell, 416 So.2d 1283, 1288 (La.1982), cert. denied, 459 U.S. 974, 103 S.Ct. 309, 74 L.Ed.2d 288 (1982).
In cases where the defendant knows through discovery of the state's intention to introduce the statement and the statement is later properly admitted, the prosecution's premature mention of the statement in its opening statement causes no prejudice to the defendant. State v. Whitmore, 353 So.2d 1286, 1289 (La.1977). Here, the defendant had pre-trial notice of the state's intention to introduce the statements. The trial judge properly admitted the testimony during trial. Thus, the defendant suffered no prejudice from the state's premature mention of his inculpatory statements in its opening statement. *233 The trial judge did not err in denying the defense motion for mistrial.

Ineffective Assistance of Counsel
Appellate counsel assigns error in trial counsel's conduct at the guilt phase. First, trial counsel allegedly afforded ineffective assistance by failing to bring to the jury's attention the lack of ballistics evidence linking the gun used in the robbery to the gun found in the trailer. Second, trial counsel allegedly afforded ineffective assistance by failing to anticipate the state's intention to introduce a handwriting expert's testimony to identify Strickland as the author of letters written to Kimberly Atkins. Finally, trial counsel was allegedly ineffective in failing to obtain experts in ballistics, firearm, handwriting, and footprint analysis.
To prevail, the defendant must show both counsel's inadequate performance and that this inadequate performance prejudiced him to the extent that his trial was rendered globally unfair and the verdict suspect. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although generally not considered on direct review, the record provides sufficient evidence to decide this issue. State v. Mitchell, 94-2078, p. 6 (La. 5/21/96); 674 So.2d 250, 255, petition for cert. filed.
Appellate counsel argues the ballistics report showed there was "no match" between the automatic pistol seized at the trailer and the shell casing found at the scene or the bullet removed from the victim's body. Brief, at p. 54. The ballistics report, however, showed:
The bullet in Item 1 was determined to have the same class characteristics as the reference bullets fired from the .380 caliber Bryco Arms Pistol, Model 48, Serial # 058815; however, the bullet was unable to be identified as having been fired from the pistol in Item 3.

The fired .380 caliber cartridge case in Item 2 was determined to have similar class characteristics as the reference fired cartridge cases from the .380 caliber Bryco Arms pistol, Model 48, Serial # 158815 in item 3; however, the fired cartridge case retained insufficient individual markings for positive identification.

Vol. 1, p. 163 (emphasis supplied). Thus, the report's conclusion was that the tests proved inconclusive, not that there was "no match." The decision not to use the ballistics report was likely a tactical decision by trial counsel. The defense had successfully suppressed the pistol seized at the trailer; the state was prohibited from admitting the actual weapon into evidence. Entering into evidence a report indicating there was a possibility that the gun being described by the witnesses could have been the gun used, even though the report was inconclusive, could have been more damaging than not using it. This conclusion is bolstered by later statements of trial counsel in guilt phase closing argument:
We've heard a lot and seen a lot of bullets. We've seen a big box of bullets up here and we've seen three or four loose bulletshowever many. And we've got a projectile here that was entered into evidence by the State, but I didn't hear anymore about it. Maybe we should have heard from a ballistics expert, because they do have them, they've had them for a long time, to tell us what kind of gun that thing came out of. That wouldn't have been too hard.
Vol. 7, p. 1594. Rather than show a lack of preparedness, as argued by appellate counsel, this passage argued that the state never proved any physical link between the gun the witnesses referred to and the gun used in commission of the crime. This tactic was a reasonable strategy decision which will not be second-guessed by this Court. State v. Myles, 389 So.2d 12, 31 (La.1980). Trial counsel's performance did not fall below an objective standard of reasonableness; the defendant is unable to show he was rendered ineffective assistance on this ground.
Appellate counsel's second basis for arguing trial counsel ineffectiveness is counsel's failure to anticipate the state's use of a handwriting expert to identify letters written by Strickland to Kimberly Atkins. Appellate counsel cites trial counsel's failure to traverse the state's expert and failure to have an independent handwriting expert as examples *234 of inadequate performance. Assuming that counsel was unaware and that his actions do not constitute a strategic choice, other evidence (the testimony of the letters' recipient, Atkins) established the letters' source in seemingly irrefutable detail. In this argued assignment, counsel does not maintain the defendant did not write the letters or that a defense expert would have cast doubt on the letters' authenticity. It is hard to see what the expert's testimony added to the state's case or how the defense could meaningfully have resisted the introduction or countered the impact of this testimony. Further, no prejudice arising to the level required by Strickland occurred. Defendant does not show counsel was ineffective on this ground.
Finally, trial counsel's failure to obtain the cited experts does not satisfy the Strickland standards. Trial counsel was able to argue lack of a physical link between the murder weapon and the weapon described by witnesses. As earlier stated, it may have been sound trial strategy not to use the ballistics report. Thus, employment of a ballistics expert would not have advanced the defense's argument. Since the impact of the state's handwriting expert was minimal in comparison to Atkins' testimony establishing Strickland as the letters' author, the impact of a defense handwriting expert would also have been minimal. Appellate counsel's arguments of the need for obtaining a footprint expert are speculative and do not show counsel ineffectiveness.

Brady issue
The defendant argues the state withheld impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Kimberly Atkins testified that Strickland told her that he had planned the robbery after reconnoitering the bank the night before and watching a Shop Rite employee make a night deposit. Appellate counsel asserts he discovered a copy of a supplemental police investigative report in documents obtained from trial counsel indicating that Shop Rite employees do not make night deposits. Brief, Exhibit 3. Appellate counsel argues trial counsel could have cross-examined Atkins on this point and impeached her testimony. Appellate counsel does not know when this supplemental report came into trial counsel's possession. If this information was not disclosed pre-trial, appellate counsel argues the state improperly withheld evidence. If trial counsel received this information pre-trial, appellate counsel argues trial counsel was ineffective for failing to use the information at trial.
Brady held that the suppression of evidence by the prosecution which is favorable to the accused violates due process where the evidence is material either to guilt or punishment, regardless of whether the prosecutor is in good or bad faith. Id., 373 U.S. at 87; 83 S.Ct. at 1196-1197; see State v. Marshall, 94-0461, 81-3115, p. 12-13 (La. 9/15/95); 660 So.2d 819, 825. The Brady rule applies to both exculpatory evidence and impeachment evidence. U.S. v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Marshall, p. 13; 660 So.2d at 825. Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. A "reasonable probability" has been interpreted as "a probability sufficient to undermine confidence in the outcome." Id. The defense does not have to show the evidence would have resulted in a different verdict, but only that, despite its absence, there was a fair trial, a trial which results in a verdict worthy of confidence. Marshall, p. 14; 660 So.2d at 825 (citing Kyles v. Whitley, ___ U.S. ___, ___, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)).
The supplemental report is dated June 17, 1993, the last day of the trial and a day after Kimberly Atkins testified. The report was prepared by Det. Hilton and contains hearsay information from the Shop Rite manager on the date of the crime. The manager advised the detective that she never made night deposits because it was against company policy. Brief, Exhibit 3. There is no indication when this information was disclosed to the defense. However, the fact that the report was found among documents in trial counsel's possession indicates there was no failure to disclose.
Assuming arguendo that the report was not disclosed until after trial, the suppressed *235 report's impeachment evidence does not reach the level of materiality which undermines confidence in this trial's outcome. Defense trial counsel's cross-examination of Atkins shows he had investigated this aspect of Atkins' testimony. When she stated Strickland told her the Shop Rite employee made a night deposit after the store closed and that Strickland was going to determine what time the store closed the following evening, trial counsel effectively impeached Atkins with the fact that the store was open 24 hours a day. Atkins' testimony was thus already impeached. The fact that trial counsel was unable to further impeach Atkins on this point did not result in Strickland failing to receive a fair trial.
As to appellate counsel's ineffective assistance argument, the record shows trial counsel did effectively cross-examine Atkins. By arguing trial counsel should have conducted a better cross-examination on this point, appellate counsel is merely allowing the "distorting effects of hindsight," Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, to provoke him into "second-guess[ing] strategic and tactical choices made by trial counsel." Myles, 389 So.2d at 31.

Gun-Related Testimony
The defendant argues the trial judge erred in admitting testimony about the gun used in the robbery when the trial judge ruled the gun itself inadmissible. This Court has already determined that issue in a similar case. In State v. Johnson, 371 So.2d 1155 (La.1979), the defendant was charged with armed robbery. A pistol, seized from the defendant's automobile, was excluded from evidence at a suppression hearing. At trial, bank employees both testified they saw the bank robber armed with a gun. Relying on State v. Marshall, 359 So.2d 78 (La.1978), this Court held that the policies underlying the exclusionary rule and the "fruit of the poisonous tree" doctrine were not advanced by forbidding the armed robbery victims to testify that they saw a pistol in the defendant's hand before the unconstitutional search and seizure. Johnson, 371 So.2d at 1158. The same reasoning applies in this case. Atkins testified she stole the gun from her brother and gave it to Strickland and Boyd. She related how the men practiced firing the gun. Atkins, McCormic, and Dempsey testified the men constantly handled the gun inside the trailer and took it with them. Atkins testified the men had the gun with them when she dropped them off on the night the crime was committed. Thus, this admitted testimony had no connection to the (arguably) illegal seizure of the gun; no testimony referred to the gun's discovery at the mobile home.
In a related argument, the defendant urges that the three women's testimony should have been suppressed as tainted by the illegal seizure of the gun. The issue is whether the connection between the illegal conduct of the police and the challenged evidence has become so attenuated as to dissipate the taint. United States v. Ceccolini, 435 U.S. 268, 273-274, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978). In making this determination, courts must consider 1) the proximity in time between the illegal seizure, the decision to cooperate and the testimony at trial; 2) the role of the illegally seized evidence in gaining the witness's cooperation; 3) whether the witness's decision to testify is an act of free will; and 4) the police's motivation in engaging in the illegal conduct. Id., 435 U.S. at 279-280; 98 S.Ct. at 1062; see State v. Kent, 391 So.2d 429, 432 (La.1980).
The record shows the women were taken to the station for questioning as to their involvement and knowledge of Strickland's and Boyd's escape, not because a gun had been found. The women's statements to the police were the product of their own free will; they were not under arrest, coerced or threatened in any manner. As previously discussed, the officers' actions in entering the trailer may have had a proper basis. In any event, they did not enter the trailer solely to seize this weapon. The women's testimony was attenuated from and not the product of the (arguably) illegal seizure. Government "illegality ... very often will not play any meaningful part in the witness' willingness to testify," because "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition." Ceccolini, 435 U.S. at 276-277, 98 S.Ct. at 1060.

*236 Failure of Sequestration

The defendant argues the state witnesses violated the sequestration order imposed on them by the trial judge while awaiting their turn to testify. The defendant bases this claim on a portion of the Capital Sentence Investigation Report in which the victim's mother describes sitting with Atkins, McCormic and Dempsey. The statement does not say where the victim's mother was when she sat with the other women. Even assuming the witnesses were all together somewhere unsupervised while they waited to testify, the defendant does not show any violation of the sequestration rule.
La.C.Cr.P. art. 764 provides that exclusion of witnesses is governed by La.C.E. art. 615. La.C.E. art. 615 states that on a party's request, a judge must order witnesses excluded from the courtroom and must order them to "refrain from discussing the facts of the case with anyone other than counsel in the case." The trial judge entered such an order. The defendant does not suggest that the witnesses either heard each other testify or violated the order by discussing the facts of the case. The conversations which the victim's mother overheard did not have anything to do with the case. The mere fact that a state witness speaks to other witnesses does not establish a violation of the order of sequestration and does not show possible prejudice. State v. Armstead, 432 So.2d 837, 842 (La.1983).

Defendant's Presence
The defendant argues he was not present at critical stages of his trial, in violation of his constitutional and statutory rights. He points specifically to a conference in chambers during which he claims counsel came to some form of agreement concerning several items of state evidence presented to the jury. The defendant claims his absence violated his constitutional due process rights and La. C.Cr.P. art. 831(4), which requires the defendant's presence "at all times during the trial when the court is determining and ruling on admissibility of evidence."
The record does not show whether the defendant was present at this chambers conference. Assuming the record's silence indicates the defendant's absence, State v. Walker, 374 So.2d 1223, 1226 (La.1979), his counsel was present. Although La.C.Cr.P. art. 832 provides that a capital defendant may object to his temporary voluntary absence at a proceeding even if his counsel were present, the defense waived any claim based on the error by failing to object. La. C.Cr.P. art. 841; Taylor, 93-2201, p. 4-7, 669 So.2d at 367-369.
However, the record shows no violation of La.C.Cr.P. art. 831(4) ever occurred. The admitted evidence of which the defendant complains were the letters written by Strickland to Atkins. The admissibility of these documents was determined pretrial at a suppression hearing attended by the defendant. The record comments of the trial judge and counsel reveal the purpose of the chambers conference was to delete portions of the letters which described other crimes evidence and which were deemed irrelevant or highly prejudicial to the defense. Thus, no determination of admissibility was undertaken at this chambers conference in violation of Strickland's constitutional or statutory rights. The defendant's absence from this chambers conference, wherein the trial judge and counsel excised material prejudicial to the defense from evidence already-determined admissible, resulted in no prejudice to the defendant. Although the defendant claims he was absent at other critical portions of his trial, he is unable to specify when this occurred.

Closing Argument Reference
The defendant argues he was denied due process and a fair trial when the prosecutor referred to matters outside the record, stating in closing argument:
"But what about Donald Baker and Rogena Craven, when they heard and ... saw a man running across the parking lot in dark clothing wearing combat boots or something that-running very heavily on the concrete..."
Vol. 7, p. 1604 (emphasis supplied). The defendant argues Rogena Craven never described the footwear of the person she saw *237 running across the parking lot and Donald Baker never saw the person whose footsteps he heard.
Since no objection was made to this statement, the defense waived any claim based on the remark. La.C.Cr.P. art. 841; Taylor, 93-2201, p. 4-7, 669 So.2d at 367-369. However, the record contained evidence the defendant wore combat boots, the boots themselves were entered in evidence as well as a photograph of two pair of boots outside the trailer where Strickland and Boyd were arrested. The prosecutor's comment merely asked the jury to draw the permissible inference that the heavy footsteps heard by witnesses as the gunman fled the scene of the shooting came from the same pair of boots police found outside the defendant's door. La.C.Cr.P. art. 774 confines the scope of argument to admitted evidence, lack of evidence, conclusions of fact which may be drawn therefrom, and the applicable law. The prosecutor committed no error in his closing argument.

PENALTY PHASE

Aggravating Circumstance
After the close of the penalty phase, at which the state re-introduced all the guilt phase evidence and testimony, and penalty phase instruction, the jury retired to deliberate. During deliberations, the foreperson sent a note to the judge requesting that the jury be allowed to review letters written by Strickland which were introduced in the guilt phase. The jury was brought into the courtroom. The judge convoked a bench conference at which he decided that allowing the jurors to read the letters might "be getting into something that really is not claimed by the State." Vol. 7, p. 1655. The judge evidently meant by this that the letters might introduce into the deliberations aggravating factors other than the one charged. In explaining his decision not to allow the letters into the jury room, the judge announced to the jury:
You present a problem to the Court here, and let me explain what that problem is. There is only one aggravating circumstance which was claimed by the State, and that is the armed robbery, and you have already found the accused guilty of that aggravating circumstance. If I permit you to read the letters again, of course you have already read them once during the guilt-determination phase of the trial, but if I permit you to read them again, it's possible that we would be getting into some other circumstance which you should not consider at this time. And so, with some reluctance, I am going to deny the request. Would you return to the jury room again, please.
Vol. 7, p. 1656 (emphasis supplied). The defense did not object to this instruction. The jury again retired to deliberate and returned with a unanimous recommendation for the death sentence.
The defendant argues the court usurped the jury's fact-finding obligation and directed the jury that they had already found the threshold aggravating circumstance. The defendant cites this incident as an example of the prejudice he suffered by the offense misjoinder.
A judge is prohibited from commenting on the evidence or giving an opinion as to what has been proved. La.C.Cr.P. art. 772. When the judge's comment was made in this case, the jury had already found Strickland guilty of first degree murder. In order to make that determination, the jury had to unanimously decide that Strickland committed the underlying felony of armed robbery. The offense misjoinder did not contribute any prejudice to this determination; the jury necessarily had to find Strickland guilty of the underlying felony before it could convict him of first degree murder.
The judge's statement did not constitute a prohibited comment on the evidence. The unanimous jury had already made its determination from the evidence in the guilt phase that Strickland was engaged in the commission of an armed robbery when he killed his victim. By this decision, the jury was aware it had met the threshold requirement which allowed it to consider the death penalty. La. C.Cr.P. 905.3. Further, the judge properly instructed the jury of its option to impose a life sentence even if it did find an aggravating circumstance. Vol. 2, p. 312.

*238 Mitigating Circumstances

The defendant argues the trial court gave inadequate guidance for juror consideration of mitigating circumstances. He asserts this created the risk that the jury would think that mitigating circumstances have to be found beyond a reasonable doubt.
This argument has previously been rejected. See State v. Tart, 93-0772, p. 41-42 (La. 2/9/96), 672 So.2d 116, 149, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (U.S., 10/15/96); State v. Jones, 474 So.2d 919, 932 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Although the Louisiana capital sentencing scheme, La.C.Cr.P. art. 905 et seq., does not set any standard of proof for mitigation evidence, this Court has determined that the lack of a standard actually gives defendants an advantage by allowing jurors to consider any amount of mitigating evidence in their determinations.

Objections to the UCSR
The Court submitted the proposed Uniform Capital Sentencing Report (UCSR) to defense counsel on October 26, 1993 and invited objections within 15 days. This was already an extension of the seven day time limit imposed by La.C.Cr.P. art. 905.9 and Rule 905.9.1 § 3(c) pursuant to Supreme Court Rule 28. A further extension of one week was granted orally. The trial judge filed the report December 1, 1993, without having received any objection from defense counsel. On December 2, 1993, defense counsel filed objections to the UCSR and requested a contradictory hearing. The trial court ordered that the defendant's objections be filed into the record but denied the requested hearing.
The defendant argues the trial judge erred in failing to hold a hearing on his objections to the UCSR. Rule 905.9.1 § 3(c) provides in pertinent part:
If the opposition shows sufficient grounds, the court shall conduct a contradictory hearing to resolve any substantial factual issues raised by the reports. (emphasis supplied)
Clearly, the objections were filed untimely. Further, a review of the objections shows no error in the trial judge's decision. None of the claimed errors raise a substantial factual issue which is compelling enough for this Court to remand for further development. State v. Tart, 93-0772, p. 50 (La. 2/9/96); 672 So.2d 116, 152, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (U.S., 10/15/96).

Ineffective Assistance of Counsel
The defendant argues he received ineffective assistance of counsel at the penalty phase. He bases this assignment on counsels' failure to present an opening or closing argument, failure to request funding for or to use mitigation experts, failure to investigate the defendant's social history for mitigating evidence, and failure to prepare the witnesses who testified on the defendant's behalf.
The defendant must demonstrate counsel error and prejudice to prevail. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Claims of counsel ineffectiveness are usually reviewed in post-conviction proceedings after an evidentiary hearing. These claims are addressed on direct review only if the record discloses sufficient evidence to decide the issues. State v. Mitchell, 94-2078, p. 6 (La. 5/21/96); 674 So.2d 250, 255, petition for cert. filed. The record as it now exists is insufficient to determine these issues; yet, the ineffective assistance claim warrants an evidentiary hearing. At this time, it is impossible to determine whether trial counsels' action not to present or argue available mitigation evidence or to argue for a life sentence
was a choice dictated following consultation with defendant or was a tactical decision of counsel that such action was the best means of prevailing at the sentencing hearing. Nor can we determine the existence, character and weight of mitigating evidence that might have been available.
State v. Fuller, 454 So.2d 119, 124 (La.1984).
Thus, the trial court is ordered to hold an expeditious evidentiary hearing on the defense's claim that Strickland received ineffective assistance of counsel relating to the penalty phase of his capital trial. If the trial court concludes that a new penalty hearing is *239 required, the trial court should order one. If the trial court denies relief, the defendant may again appeal to this Court for review of that decision. State v. Wille, 559 So.2d 1321 (La.1990); State v. Williams, 480 So.2d 721 (La.1985); State v. Fuller, 454 So.2d 119 (La.1984).

Cumulative Error
The defendant argues the cumulative error in this case requires reversal. This Court has carefully examined each of the errors assigned by both trial counsel and appellate counsel. The Court has also read the entire record for unargued error. Where error has been found, it has been determined to be harmless. Since the record is insufficient to decide the claim of ineffective penalty phase counsel, the Court has ordered an evidentiary hearing. This Court is "unwilling to say that the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction or sentence." State v. Tart, 93-0772, p. 55 (La. 2/9/96); 672 So.2d 116, 154, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (U.S., 10/15/96), quoting State v. Sheppard, 350 So.2d 615, 651 (La.1977) (interior citations omitted). A defendant is not entitled to a perfect trial, only a fair one. Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) (citation omitted); State v. Martin, 550 So.2d 568 (La.1989). The record reflects that, with the possible exception of his penalty phase counsel assistance, Strickland received a constitutionally fair trial.

CAPITAL SENTENCE REVIEW
This Court is required to review every death sentence to determine whether the sentence is constitutionally excessive. Supreme Court Rule 28; La.C.Cr.P. art. 905.9. The Court must consider (1) whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; (2) whether the evidence supported a finding of a statutory aggravating circumstance; and (3) whether the sentence, in view of both the offense and the offender, is disproportionate to the penalty imposed in other cases.
At the time of the crime, Strickland, an only child, was a twenty-two year old white male. He was married while on Army duty in Germany and has a daughter by that marriage. He completed the eleventh grade and received his GED in 1990. His intelligence level (IQ of 70 to 100) is in the medium range. Before the current offense, Strickland faced burglary, theft, and escape charges but had no prior convictions. He was not under the influence of narcotics or dangerous substances at the time of the offense.

Passion, Prejudice, or Other Arbitrary Factor
The record does not provide any indicia of passion, prejudice, or arbitrariness. Defendant is a white male. The victim was a twenty-three year old white male. Defendant and the victim did not know each other prior to the murder. This Court has rejected the defendant's argument that defense trial counsel's use of peremptory challenges to eliminate prospective male jurors violated constitutional law.

Aggravating Circumstance
The state relied on and the jury found one aggravating circumstance, the defendant was engaged in the commission of an armed robbery at the time of the victim's murder. La.C.Cr.P. art. 905.4(A)(1). The state presented more than sufficient evidence to demonstrate the aggravating circumstance of armed robbery.

Proportionality Review
The state's Sentence Review Memorandum reveals that of the twenty-three cases since 1976 in which the state has charged first degree murder in the 30th Judicial District Court, only one other jury has sentenced a defendant to death. State v. Busby, 464 So.2d 262 (La.1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), involved the planned killing and armed robbery of the perpetrator's neighbor for a perceived slight. This Court reversed the conviction on collateral review, finding that Busby received ineffective assistance of counsel during the penalty phase. State ex rel. Busby v. Butler, 538 So.2d 164, 168-173 (La.1988). The state and the defense then *240 agreed to a life sentence. Thus, Busby offers no support for the proportionality of the penalty returned here.
The state's Sentence Review Memorandum otherwise does not comply with this Court's rules because it fails to provide "a synopsis of the facts in the record concerning the crime and the defendant" for other first degree murder prosecutions in the district as required by Rule 28, § 4(b)(i). Meaningful comparison of this case with other similar first degree murder prosecutions within the district is therefore impossible.
However, the jurisprudence throughout Louisiana provides ample support for the proposition that armed robbery-murders survive proportionality review. See State v. Lindsey, 543 So.2d 886, 905-907 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Messiah, 538 So.2d 175, 189-190 (La.1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990); State v. Thompson, 516 So.2d 349, 356-357 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); State v. Bates, 495 So.2d 1262, 1276-1278 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987).

DECREE
For the reasons assigned, the defendant's first degree murder conviction is affirmed. The death sentence is conditionally affirmed. However, a final determination of the appeal is pretermitted. The case is remanded to the district court for an evidentiary hearing to determine the claim of counsel's ineffective assistance during the penalty phase, in accordance with this opinion. Defendant's right to appeal from an adverse decision on the issue is reserved.
FIRST DEGREE MURDER CONVICTION AFFIRMED; DEATH SENTENCE CONDITIONALLY AFFIRMED; REMANDED TO THE DISTRICT COURT FOR EVIDENTIARY HEARING.
CALOGERO, C.J., concurs and assigns reasons.
LEMMON, J., joins in the opinion and assigns additional reasons.
BLEICH, J., concurs in affirming the conviction and would affirm the sentence unconditionally.
CALOGERO, Chief Justice, concurs.
I concur, but write separately to stress that this Court's decision merely limits the breadth of State v. McZeal, 352 So.2d 592 (La.1977) (on reh'g) by abandoning its prejudice per se standard for appellate review of improperly joined offenses. McZeal's explanation of the four modes by which an accused may be tried is still entirely relevant at the pretrial stage. Upon pretrial motion of defense counsel, severance is mandatory if all charged offenses are not properly triable by the same one of those four trial modes.
LEMMON, Justice, joining the opinion and assigning additional reasons.
Ineffective assistance of counsel is a perplexing problem in the penalty phase of a capital case. This court long ago suggested that trial judges appoint two attorneys in a capital case in order to insure some preparation and presentation of mitigating evidence in the penalty phase and of effective argument advocating the jury's choice to spare the client's life and emphasizing the awesome decisional responsibility of the jury. That procedure is generally followed at the present time.
When there is significant variation from the usual procedure in a penalty phase, such as defense counsel's waiving closing argument, there is little the prosecutor can do. It is up to the trial judge, in my view, to inquire, outside the presence of the jury, whether there is a strategic objective for the variation and to make a record of this strategic choice for later review, not of the wisdom of the strategy, but of its existence. The hearing ordered by this court substitutes for this lack of a contemporaneous record.
NOTES
[1] Marcus, J., not on panel. Rule IV, Part 2, § 3.
[2] Strickland was also sentenced to serve 45 years at hard labor, without benefit of parole, probation or suspension of sentence, for the conspiracy to commit armed robbery conviction. Due to double jeopardy considerations, the district court vacated the armed robbery conviction. Those convictions and sentences are not at issue here.
[3] The defense did not exhaust its twelve peremptory challenges. La.C.Cr.P. art. 799.