891 So.2d 760 (2004)
STATE of Louisiana
v.
Johnny L. JONES.
No. 2003-KA-0829.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 2004.
*764 Eddie J. Jordan, Jr., District Attorney, Val M. Solino, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Kevin V. Boshea and Philip E. Hantel, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
DAVID S. GORBATY, Judge.

STATEMENT OF THE CASE
Defendant Johnny L. Jones was charged by grand jury indictment on September 3, 1998 with first degree murder, a violation of La. R.S. 14:30. Defendant pleaded not guilty at his September 9, 1998 arraignment. The trial court denied defendant's motion to suppress the evidence on January 22, 1999. On April 22, 1999, the trial court denied defendant's motion to suppress one statement, and granted the motion as to a second statement. This court denied two applications for supervisory review filed by defendant.[1] A twelve-person jury found defendant guilty as charged on September 26, 2001, at the conclusion of a three-day trial. At the sentencing hearing on September 27, 2001, the jury was unable to reach a decision on whether to sentence the defendant to death. The trial court denied defendant's motion for a new trial on April 3, 2002 and, after defendant announced he was ready, sentenced him to *765 life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. The trial court denied defendant's motion to reconsider sentence. Defendant subsequently filed an appeal.
On appeal, this court found that the trial court erred in denying defendant's motion for mistrial as to defendant being effectively denied his constitutional right to peremptorily challenge jurors. We accordingly reversed the defendant's conviction and sentence and remanded the matter to the trial court for further proceedings. The Louisiana Supreme Court granted writs on this case and found that this court erred in holding that the defendant's re-urged motion for mistrial should have been granted. The Supreme Court remanded this matter to this court for consideration of the remaining assignments of error originally raised by the defendant on appeal.

FACTS
Elizabeth McPherson, mother of victim Courtney Russ Jones, testified that the victim had been living at 3420 Havana Street for approximately two weeks at the time of her death. Before then, she had been living with defendant, her husband, in the Chenault Creek Apartments. The victim and defendant had been together for approximately four years.
New Orleans Police Officer Chris Landry testified that, at approximately 1:25 a.m. on July 29, 1998, he and his partner Officer Michael Richter were dispatched to a call at 3420 Havana Street. Officer Landry observed a dark-colored vehicle leaving as the officers arrived. The front door frame of the residence was splintered, showing signs that the door had been forced open. A bolt inserted into the threshold of the door had been dislodged by force, and had scraped the floor when the door was opened. The victim and her sister-in-law, Trina Howard, were in a bedroom inside of the residence. The victim was lying on the floor, bleeding profusely from the chest and abdomen, and exclaiming that she was dying. The victim said, several times, in response to questions from Officer Landry, that her husband had stabbed her. Her voice steadily declined, as if she was beginning to lose consciousness. Officer Landry found blood in the kitchen and bathroom.
Dr. Michael DiFatta, qualified as an expert in forensic pathology, performed an autopsy on the victim on the morning of July 29, 1998. The victim had nine stab or slash wounds. Two were defensive in nature. Three were lethal. In one wound the blade of the knife went into, but did not penetrate, one of the victim's ribs. Dr. DiFatta stated that such an impact with the rib could have caused the blade of the knife to chip, break off or bend.
Lt. Stephen J. Gordon, commander of the New Orleans Police Department's communications division, which handles 911 calls, identified a complaint history of a July 29, 1998 homicide at 3420 Havana Street. He also identified an audio cassette recording of two 911 calls made in connection with the case. The first call came in at 1:27 a.m., the second at 1:36 a.m. That cassette was introduced in evidence and played for the jury.
Officer Edward Delery, with the New Orleans Police Department's crime lab, testified that the previous day he was a potential juror for defendant's trial. He did not discover that he had processed evidence in the case until he received an instanter subpoena with the case number the following morning, and pulled out the evidence to review. Officer Delery was qualified by stipulation in the locating and lifting of fingerprints, as well as in the practices and procedures of the crime lab. He examined two empty beer bottles, two torn and empty condom packages and a *766 knife, but was unable to find any fingerprints suitable for identification. The bloodstained knife had an eight-inch serrated-edge that was bent.
Det. Lawrence Green assisted Det. Andre Gilds in taking a statement from defendant. He identified a rights of arrestee form signed by himself and the defendant and witnessed by Det. Gilds. Det. Green replied in the affirmative when asked whether defendant had indicated in his statement that he had been involved in an altercation with the victim that led to her injuries. Det. Green testified later that he applied for a search warrant for defendant's apartment.
Det. Andre Gilds testified that he met the defendant at the third district police station, where defendant voluntarily gave a statement. Defendant said he went to his wife's home to deliver a vehicle to her. He observed a blue Maxima in the driveway. He knocked on the door several times, but no one answered. He said he then kicked the door in, and observed his wife in the bedroom with another subject. That subject ran around defendant and exited the residence, at which time the victim came after defendant with a knife. Defendant said he was blocking blows with the knife, and that was how the victim got stabbed. Det. Gilds said the defendant did not have any wounds at all. The defendant lived at 12345 I-10 Service Road, in apartment 2510 of the Chenault Creek Apartments. Search warrants were secured for that apartment and defendant's car. Det. Gilds recovered a rental agreement in defendant's name inside of the apartment. The detective searched defendant's black Nissan on August 3, 1998, and recovered a registration certificate and an insurance card, both bearing defendant's name.
Det. Gilds stated on cross examination that the knife was on a table in the kitchen-dining area when he arrived at the scene of the homicide. The detective confirmed that his investigation concluded that the knife had been at the residence the entire time, and further confirmed that he had no evidence that defendant took a knife to the residence. He confirmed that defendant claimed that he went to the victim's Havana Street residence intending to deliver the black Nissan to her. Det. Gilds confirmed that a Mr. Weber reported that he had picked up the knife. Mr. Weber also related that he and the victim had been intimate on the night she was killed. Det. Gilds recalled that defendant had blood on one of his arms, and that the blood was not from a cut. Condoms were found in the bedroom.
George Weber testified that he and the victim had both been employed at Tulane University Medical Center. On the night she was killed, he worked the 3-11 p.m. shift. The victim telephoned him at work and asked him to take her to get something to eat after work. He picked the victim up at her residence after he left work and drove her to pick up some fast food. He stopped and purchased a couple of beers, and they arrived back at her residence shortly after midnight. They had sex, and Mr. Weber fell asleep. He identified a photograph depicting a nightstand next to the victim's bed, a beer bottle, a hospital identification card, and a condom wrapper.
Mr. Weber said he awoke to see the victim pacing back and forth frantically, getting dressed while talking very fast on the telephone. He thought she had called 911. After she hung up the telephone, she told Mr. Weber that "he's coming," and that "he" had said that "he" knew she was over there with "that red Army dude." A minute or two later, someone started kicking the door so hard that the structure shook. Mr. Weber said he finished dressing just as the door was flung open. He *767 grabbed a knife that was next to the bedroom nightstand, because he did not know if the intruder, who he later identified as the defendant, was armed or with others. Mr. Weber identified the murder weapon as that knife. He told defendant that he did not know what was going on between the two of them, and to let him leave. Defendant told him to leave, that they were just going to talk, and stepped aside to let him leave. As Mr. Weber walked out of the residence, he heard defendant twice say to the victim that he was going to shoot "him." Mr. Weber still had the knife in his hand, but threw it in the flowerbed once he got outside. He got into his car. As he drove away, he noticed defendant run out of the residence, jump off the porch to the area where he had thrown the knife, bend down, and then run back into the residence. Mr. Weber said he then drove around the corner and called 911.
Mr. Weber admitted on cross examination that he told police that he and the victim had a sexual relationship, although this was not reflected on his typed statement. Mr. Weber said defendant did not threaten him with a weapon, and indicated that he did not see defendant with a weapon. Mr. Weber confirmed that he told police that defendant was in a rage, although he said that was just a general statement. He stated at trial that defendant appeared to be very upset. When asked whether it was a "panic-type of situation," Mr. Weber replied, "You might say that." He did not know whether or not there had been more than one knife in the house. On redirect examination, Mr. Weber replied in the negative when asked whether he had seen any other knife in the bedroom or had seen the victim with a knife.

DISCUSSION
We note that defendant's assignments of error numbers two and three were addressed in our prior opinion. We now address the assignments of error that remain on remand.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that the trial court erred in admitting the 911 recording into evidence and permitting it to be played for the jury. Defendant argues that, generally, "under La. C.E. art. 403, the party who seeks to introduce the evidence in question must show that the probative value outweighs the prejudicial effect." This is an incorrect statement of the law, both as to substance and as to allocation of the burden of proof.
Relevant evidence is generally admissible. La. C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. It is self-evident that a party seeking to introduce evidence over an objection bears the burden of showing that it is relevant. However, it is equally self-evident that once that burden is met, the burden shifts to the party opposing the introduction of the evidence to show that the evidence is inadmissible under La. C.E. art. 403 because its probative value is substantially outweighed by its prejudicial effect.
A trial court's ruling as to relevancy will not be disturbed absent a clear abuse of discretion. State v. Lewis, 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 *768 So.2d 1004, 1017; State v. Badon, 95-0452, p. 8 (La.App. 4 Cir. 11/16/95), 664 So.2d 1291, 1296. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. See State v. Lambert, 98-0730, p. 22 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755; State v. Brooks, 98-0693, pp. 16-17 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 822-823.
At a January 22, 1999 pretrial hearing, the prosecutor stated that she wished to play the 911 recording. Defense counsel said he did not see a need to play the recording. The prosecutor said she needed to play the recording in relation to the dying declaration issue. Defense counsel stated that he was going to waive the objection on the dying declaration. Nevertheless, the recording was played. Afterward, defense counsel said he had no objection as to the dying declaration. He further stated that he might have an argument later as to the admissibility of the 911 recording, although he was not going to address the issue at the hearing that day. The trial court stated that as to the dying declaration issue, it was going to permit it to be introduced. As to the probative value being substantially outweighed by the prejudicial effect, the court indicated that it would decide that later.
The transcript of a November 19, 1999 hearing is attached to defendant's brief. During that hearing, the trial court said it would not permit the introduction of some 911 calls from the victim's neighbors and from the daughter of one of those neighbors. In addition, the court would not permit the introduction of a 911 call in which a person, presumably the victim, could be heard gasping for air. The trial court said it was going to permit the introduction of the victim's first call, made as the defendant was breaking into her residence, and the subsequent call in which she said she was dying. Defense counsel objected, apparently on the ground that the probative value of that evidence was substantially outweighed by its prejudicial effect.
During trial, before the recording, State Exhibit # 16, was introduced into evidence, the court asked if there were any objections. Defense counsel stated that his objection had already been noted. The only reference to a specific objection made during trial is found in a separate transcript contained in the record of a conference held in chambers. The 911 recordings were played for the court, and the court stated that it was going to permit it. Defense counsel noted his objection. One of the prosecutors asked whether that was as to the boyfriend's call, and the court replied in the affirmative.
In the 911 recording that was played for the jury, State Exhibit # 16, the first call on the tape was a female who calmly asked for police to come out because her husband was breaking into her residence at 3420 Havana Street. The line suddenly went dead. In the second call, a female repeatedly stated in a very faint voice that she was dying, reiterating her address once. In the background, one could hear another female in an obviously excited state, and a male who told the victim several times, addressing her by her first name, not to move.
Another 911 recording, State Exhibit # 17, was introduced in evidence but was not played for the jury. In that recording, George Weber's 911 call is heard, as well as 911 calls from the victim's neighbors and the daughter of one of those neighbors.
The State was required to prove that defendant killed the victim, and did so while committing an aggravating burglary. The 911 recording was evidence tending to *769 prove that the defendant broke into the victim's home and stabbed her so badly that she thought she was going to die. Thus, it was relevant. The 911 recording was properly prejudicial to defendant because it tended to prove that he murdered the victim during the commission of an aggravated burglary. However, the 911 recording did not improperly prejudice defendant. It cannot be said that the trial court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by any improper prejudicial effect.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant claims the trial court erred in denying his motion to suppress a non-recorded verbal statement given by him. Defendant did not invoke his right to counsel until after waiving his rights and making a brief statement. When he invoked his right, police ceased all questioning. Defendant fails to cite any jurisprudential or statutory authority for the proposition that defendant's statement had to be recorded to be admissible at trial.
Generally, before the State may introduce an inculpatory statement or confession into evidence, it must affirmatively show that the statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451. The State must prove that the accused was advised of his Miranda[2] rights, and voluntarily waived these rights in order to establish the admissibility of a statement made during custodial interrogation. State v. Green, 94-0887, pp. 9-10 (La.5/22/95), 655 So.2d 272, 280; State v. Labostrie, 96-2003, p. 5 (La.App. 4 Cir. 11/19/97), 702 So.2d 1194, 1197. A court must look to the totality of the circumstances surrounding the making of the statement to determine its voluntariness. State v. Lavalais, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053. The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given. State v. Jones, 97-2217, p. 11 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 396. Whether a statement was voluntary is a fact question; thus, the trial court's ruling, based on conclusions of credibility and the weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support it. State v. Byes, 97-1876, pp. 11-12 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, 765; State v. Parker, 96-1852, pp. 12-13 (La.App. 4 Cir. 6/18/97), 696 So.2d 599, 606.
In the instant case, Det. Andre Gilds testified at the motion to suppress hearing that defendant made two statements. Defendant surrendered to police at approximately 3:00 a.m. on July 29, 1998. Det. Gilds testified that he advised defendant of his rights by reading the rights of arrestee form to him. Defendant verbally waived his rights and signed the form, although no box was checked off on the form signifying that he waived his rights. Defendant then gave a verbal statement. Afterward, police asked defendant if he would give a taped statement. However, defendant said he would like to consult with an attorney before giving a taped statement. At that point questioning stopped. Det. Gilds testified that only then did police check off a box on the rights of arrestee form, the one reflecting that the arrested person wished to consult with an attorney before making a statement. Defendant was then booked with attempted murder. Det. *770 Gilds said he was notified at approximately 9:00 a.m. that the victim had died. Defendant was again advised of his rights and told he was being booked with first degree murder. He indicated that he understood his rights, signed another rights of arrestee form, and gave a taped statement.
The record furnishes a basis to conclude that both statements were free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises, and that defendant was properly advised of his Miranda rights before he gave the statements, understood those rights, and voluntarily waived them before giving his verbal statement, as well as his second statement, which was recorded.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO 5
In this assignment of error, defendant claims that the evidence was insufficient to support his first-degree murder conviction, only a conviction for manslaughter.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra."[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant concedes in this assignment of error that there was no dispute that he *771 killed the victim. Defendant was charged with first-degree murder, specifically, the killing of the victim while engaged in the perpetration of an aggravated burglary. La. R.S. 14:31(A) defines first degree murder in pertinent part as the killing of a human being when the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated burglary. La. R.S. 14:60 defines aggravated burglary in pertinent part as the unauthorized entering of any inhabited dwelling with the intent to commit a felony therein, if the offender arms himself with a dangerous weapon after entering or commits a battery upon such person while in such place.
Defendant argues that the State did not prove that defendant "was going to the house that night to commit an aggravated burglary." The State did not have to prove that defendant went to the victim's residence intending to commit an aggravated burglary; only that he did in fact commit an aggravated burglary there. Defendant also argues that the State failed to prove that he had the specific intent to kill the victim that night. The State did not have to prove that defendant had the specific intent to kill the victim; proof that he specifically intended to inflict great bodily harm on her would be sufficient to support a conviction for first degree murder.
George Weber testified that he armed himself with a knife he found in the victim's bedroom after defendant broke into the victim's residence to find her and Mr. Weber inside. He identified the knife as the murder weapon when it was shown to him at trial. Mr. Weber retained the knife in his possession, to defend himself if necessary, until he safely got outside the victim's residence. He then discarded the knife into the flowerbed. As he drove away, Mr. Weber said he observed defendant run outside, jump off the porch to the area where he had thrown the knife, bend down, and then run back into the victim's residence. Viewing this and all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the offense of aggravated burglary present beyond a reasonable doubt. That is, the jury could have found that defendant exited the victim's residence, grabbed the knife that Mr. Weber had discarded, and reentered the victim's residence without her authorization, with the intent to commit a felony therein, i.e., to kill or to inflict great bodily harm on her.
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Hebert, XXXX-XXXX, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050. Specific intent can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390.
Viewing all of the evidence in favor of the prosecution, pretermitting for a moment discussion of the issue of manslaughter, any rational trier of fact could have found beyond a reasonable doubt all of the essential elements of the offense of first degree murder  that defendant killed the victim while having the specific intent to kill her or inflict great bodily harm on her, and did so while engaged in the perpetration of an aggravated burglary.
Defendant submits that the evidence was only sufficient to convict him of the crime of manslaughter. La. R.S. 14:31 defines manslaughter in pertinent part as *772 a homicide which would be a first or second degree murder, but:
[T]he offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. . . ."
The Louisiana Supreme Court explained the relationship between the two separate offenses of homicide and manslaughter in State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838, as follows:
It is the presence of "sudden passion" and "heat of blood" that distinguishes manslaughter from murder. This court has repeatedly stated, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors. State v. Lombard, 486 So.2d 106 (La.1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
98-1078, p. 4, 750 So.2d at 837-838.
Defendant submits that seeing his wife just after she had sex with another man was sufficient provocation to deprive him of his cool reflection and cause to stab the victim in sudden heat of blood.
Defendant cites Snyder, supra, in which the Louisiana Supreme Court affirmed the first-degree murder conviction of the defendant, rejecting a manslaughter argument. The defendant in Snyder called his estranged wife one evening, wanting to meet her. She agreed to meet him the following day to discuss reconciliation, but told him she did not want to see him that night. She went out on a date with a married man that evening. The defendant repeatedly paged her throughout the evening, but she refused to respond. The wife and her date drove up to her mother's home at 1:30 a.m., remaining in the vehicle for an unknown period. The defendant went to the home armed with a knife. A witness observed the defendant stoop down alongside of a trailer across the street, then run to the car. The defendant opened the door of the car, jumped in, and attacked the couple with the knife, killing the male and inflicting nineteen wounds on his estranged wife. The defendant testified that he went there that night to talk, to see who his wife was with, and brought the knife along to scare her and make them talk to him. He said when he opened the car door he told his wife's date they needed to talk, and then a scuffle ensued. There was no evidence that the male and the defendant's wife were involved in any type of sexual activity when the defendant came upon them. The defendant had told two differing accounts of the events, to police on the one hand and to doctors on the other.
The Supreme Court in Snyder found that the jurors may have rationally concluded either that (1) defendant lied about the circumstances to excuse his actions, which otherwise overwhelmingly demonstrated a specific intent homicide; or (2) a reasonable person would not have been provoked to homicidal passion by the sight of his estranged wife with another man. The court found that in either case, the evidence supported the jury's verdict and *773 rejection of the defendant's manslaughter defense.
In the instant case, while it is undisputed that George Weber and the victim had sexual relations that night, both the 911 recording and Mr. Weber's testimony establish that the victim was on the telephone before defendant succeeded in breaking in her front door. Mr. Weber said he finished dressing just as the door was flung open. Thus, just as in Snyder, defendant did not catch the two in flagrante delicto. Further, Mr. Weber related that after the victim hung up the telephone, from what he assumed had been a 911 call, she told him that "he's coming," and that "he" said that "he" knew she was over there with "that red Army dude." This suggests that defendant suspected the victim was with someone before he even got to her residence, not that he was surprised upon entering the residence.
Although Mr. Weber admitted that he characterized defendant to police as having been in a rage, he testified at trial that this had been a general statement, and that defendant was simply very upset. Defendant permitted Mr. Weber to walk out of the residence. Mr. Weber was armed at the time with a knife, and his testimony at trial was that he had been prepared to defend himself. The jury could have inferred that defendant retained enough of his self-control and cool reflection to realize that he might not be able to "take" Mr. Weber, and so permitted him to leave. Also, defendant was not so enraged that, for instance, he started pummeling the victim with his fists. Rather, he waited until Mr. Weber left the residence, got into his car, and started to drive away. The defendant then ran outside, retrieved the knife, and went back inside where, shortly thereafter, he inflicted the fatal wounds on the victim. Defendant told police that after Mr. Weber left, the victim attacked him with a knife, that he blocked the blows with "the knife," and that was how the victim was stabbed. This, of course, is contradictory to a manslaughter defense, as it essentially is a claim of self-defense, with no suggestion that defendant acted in sudden passion or heat of blood while intentionally killing the victim.
It cannot be said that defendant proved by a preponderance of the evidence that he killed the victim in sudden passion or heat of blood, caused immediately by sudden provocation sufficient to deprive a reasonable person of his self-control and cool reflection.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6
Relying on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defendant claims that the trial court erred in not granting a mistrial when the prosecution failed to disclose the crime tech report written by officer Delery until the day after voir dire. The report revealed the identifiable fingerprints could not be located on various pieces of evidence.
In his discovery requests, defendant sought a description of any physical evidence in the possession of the State that it intended to use at trial, and the names, titles and last known business addresses of each person who conducted any chemical, physical or other scientific tests or examinations of such evidence. Defendant also asked if any written report was made of any such examinations or tests. Finally, defendant requested the nature and description of any exculpatory evidence or evidence favorable to him. In its December 4, 1998 answers, the State did not disclose the name of Officer Delery, the tests he conducted on evidence, or his October 27, 1998 report. The State's responses simply named another individual *774 from the crime lab who tested stains for the presence of blood, and a condom for the presence of seminal fluid.
Assistant District Attorney Jonathan Friedman testified that he had been assigned defendant's case the previous Wednesday, and that Officer Delery's report was not in the district attorney's case file. Investigating Det. Andre Gilds gave Mr. Friedman the police case file the day voir dire was conducted, and Mr. Friedman said he reviewed it over night and that morning for exculpatory information. He discovered Officer Delery's one-page report that morning, when he walked into his office at 8:15 a.m. He notified defense counsel at 8:45 a.m. Mr. Friedman testified that on the Saturday prior to trial, he had presented his entire case file to defense counsel.
The trial court denied defendant's motion for mistrial, although the court found negligence in the State's handling of the case. The court added that it found no ethical violation on the prosecutor's part. Defense counsel noted an objection.
La.C.Cr.P. art. 775 provides that the trial court "shall" grant a mistrial "when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial." In addition, La.C.Cr.P. art. 729.5 provides that a trial court "may" order a mistrial on motion of defendant, when the State fails to comply with discovery requirements, i.e., La.C.Cr.P. art. 719(A). "Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown." State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
Defendant requested the nature and description of any exculpatory evidence or evidence favorable to the defendant. Therefore, the State had a duty to disclose any such evidence to the defendant under Brady; see also La.C.Cr.P. art. 719(A). The State responded to defendant's request for exculpatory evidence by stating that it had none at the time of its December 4, 1998 answer. In State v. Lindsey, 98-1064 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, this court set forth the applicable law pertaining to the State's disclosure of exculpatory evidence, or Brady material, as follows:
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Brady rule is based on due process of law. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was first established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 *775 (1985). However, in Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court recently outlined the considerations for determining whether allegedly-suppressed evidence is material. These considerations were summarized in a recent decision by the Louisiana Supreme Court, State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819:
The issue is whether the exculpatory evidence is material under the Brady-Bagley-Kyles line of cases. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. [United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)]. [The reviewing court] must provide a cumulative evaluation of the suppressed evidence, keeping in mind that [the defendant] does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. [The defendant] need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Kyles, 115 S.Ct. at 1569.

State v. Marshall, 94-0461, pp. 19-20, 660 So.2d at 826.
98-1064, pp. 2-3, 715 So.2d at 546.
Late disclosure as well as non-disclosure of exculpatory evidence may deprive the defendant of a fair trial. State v. Kemp, 2000-2228, p. 7 (La.10/15/02), 828 So.2d 540, 543. The prosecution must make timely disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case. Id. Moreover, the State is not necessarily absolved of its responsibilities under Brady simply because the prosecution does not possess or have knowledge of evidence, because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." State v. Louviere, 2000-2085, p. 13 (La.9/4/02), 833 So.2d 885, 896, quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
Officer Delery was called as a witness by the State at defendant's trial, and testified on both direct and cross examination that no fingerprints suitable for identification were recovered from any of the items he examined that were collected as evidence from the victim's residence, including the murder weapon. There is no indication that the State's disclosure of this evidence to defendant on the second day of trial, after voir dire but before any witnesses were sworn, deprived defense counsel of an adequate opportunity to use the material effectively. Therefore, the trial court properly denied the motion for mistrial insofar as it was based on the ground of a Brady violation. For these reasons also, it cannot be said that the trial court would have abused its discretion in declining to grant the motion for mistrial as a sanction pursuant to La.C.Cr.P. art. 729.5(A). This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 7
In this assignment of error, defendant argues that the trial court erred in denying his motion to suppress the evidence obtained from the search of defendant's apartment and car pursuant to search warrants, because the suppression *776 hearing was held during trial and because the evidence was irrelevant.
When the State prepared to have Det. Gilds identify the three items of evidence seized pursuant to the search warrants issued for defendant's apartment and car  copies of defendant's apartment rental agreement, his vehicle registration certificate and his proof-of-insurance card  defendant objected that no motion to suppress had been held as to the items seized pursuant to the search warrants. At that point the trial was stopped, and a motion to suppress the evidence was held out of the presence of the jury. The trial court denied the motion to suppress and denied defendant's motion for a mistrial based on defendant's allegation that somehow the State was at fault in failing to ensure that an earlier motion to suppress was held as to this evidence.
There is no merit to this claim of error. The record reflects that defendant filed a motion to suppress the evidence on September 9, 1998. The record contains a transcript of a January 22, 1999 hearing on defendant's motions to suppress the evidence and confession. The record was supplemented with this transcript after defendant filed his appellate brief. At the January 22, 1998 hearing, defense counsel specifically announced to the court that he was ready as to the motion to suppress the evidence seized pursuant to the search warrant. Det. Andre Gilds testified that he applied for the two search warrants, and he described the evidence recovered pursuant to the two searches. The trial court specifically denied the motion to suppress the evidence seized pursuant to the two search warrants. All parties and the trial court were mistaken in expressing belief during trial that no motion to suppress hearing had been held as to the items seized pursuant to the search warrants.
As to defendant's claim that the evidence was irrelevant, defense counsel did not object to the evidence on that ground at either the motion to suppress hearing or at trial. Therefore, he failed to preserve that issue for review. La. C.Cr.P. art. 841(A).
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 8
In this assignment of error, defendant argues that the trial court erred in denying his motion for mistrial made after the State referred during its opening statement to defendant informing police that he wished to speak with an attorney before giving a taped statement.
In his opening statement, the prosecutor informed the jury that it would hear that defendant was read his rights and made a statement, then was asked by the detective if he would make a taped statement, at which time the defendant said he would like to speak with an attorney. At the close of the prosecutor's opening statement, defense counsel objected to the reference about defendant stating that he would like to speak with an attorney, citing Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
In Doyle, the court held that the use for impeachment purposes of a defendant's silence at the time of arrest, after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment. 426 U.S. at 619, 96 S.Ct. at 2245. The court noted that the State had not argued that such use under the circumstances of the case was harmless error, and consequently reversed the petitioners' convictions.
La.C.Cr.P. art. 775 provides that the trial court shall grant a mistrial when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant *777 to obtain a fair trial. "Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown." State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
In State v. Price, XXXX-XXXX (La.App. 4 Cir. 4/2/03), 842 So.2d 491, the defendant argued that the trial court erred in denying his motion for mistrial, made after the prosecutor referred in his opening statement to the defendant having surrendered with a letter from his attorney advising authorities that he had an attorney, that they were not to talk to the defendant or ask him anything, and asserting that this was the defendant's right [to remain silent]. The State submitted in its brief on appeal that the remark was directed to showing the circumstances of the defendant's arrest, not to exploit his choice to remain silent at the time of his arrest. This court found no reversible error, relying on the decision by the Louisiana Supreme Court in State v. George, 95-0110 (La.10/16/95), 661 So.2d 975.
In George, the trial court denied the defendant's motion for a mistrial, made after the prosecutor asked a detective whether the defendant had made any statements after being advised of his right to remain silent, and the detective replied in the negative. The State maintained that the line of questioning was an attempt to summarize the extent of the investigation, not to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. The court stated:
Although this case, unlike State v. Mosley [390 So.2d 1302 (La.1980)], involves an explicit mention of the defendant's post-arrest silence, Doyle [v. State of Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)] condemns only "the use for impeachment purposes of [the defendant's] silence at the time of arrest, and after receiving Miranda warnings. . . ." Doyle v. Ohio, 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d 91 [emphasis supplied]; see State v. Arvie, 505 So.2d 44, 46 (La.1987), wherein we stated ". . . the prosecutor may not use the fact of an accused's exercise of his constitutional right to remain silent, after he has been advised of this right, solely to ascribe a guilty meaning to the silence or to undermine by inference an exculpatory version related by the accused for the first time at trial." In this case, the trial judge's admonition made the prosecutor's remarks too obvious to miss, and invited the jurors to wonder why the defendant did not offer his alibi defense to the police at the time of his arrest. Nevertheless, in brief, counsel does not dispute the state's claim that it did not affirmatively exploit the testimony to impeach the defendant's exculpatory account offered at trial. In the absence of that affirmative misconduct by the state, reasonable jurors may have understood the testimony in the way that the first circuit took the remarks, as a description of how the police investigation culminated in the formal arrest of the defendant with the routine incidents of custody, e.g., the reading of Miranda warnings to the person arrested. Accordingly, we find this assignment does not present reversible error.
95-0110, pp. 9-10, 661 So.2d at 980.
In the instant case, the prosecutor who made the reference argued against defendant's *778 motion for mistrial on the ground that the defendant's assertion of his right to consult with an attorney before giving a taped statement was simply part of the verbal statement defendant was making at the time, after having waived his right against self-incrimination. It appears that, as in Price, the prosecutor's remark was not intended to exploit defendant's assertion of his right to remain silent. As in George, reasonable jurors may have understood the prosecutor's remark in the instant case simply as a description of how the police investigation culminated in the formal arrest of the defendant, with the routine incidents of custody, such as the reading of the Miranda warnings to defendant. It cannot be said that the trial court abused its discretion in implicitly determining that defendant was not substantially prejudiced by the comment, and in denying the motion for mistrial.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 9
In this assignment of error, defendant claims that the trial court erred in denying his motion for a new trial, based, in pertinent part, on the ground that a juror, Ralph Akins, had previously been convicted of aggravated burglary. At the hearing on defendant's motion for new trial, defense counsel acknowledged that Mr. Akins had provided information to the Jury Commission about his conviction. In his motion for new trial, defense counsel admitted that he did not voir dire prospective jurors regarding their criminal history, citing a practice by the district attorney's office of screening the criminal backgrounds of the venire. The State countered that Mr. Akins, as a first offender, had automatically been pardoned. Defendant acknowledges that fact in his brief on appeal. La.C.Cr.P. art. 401(A) sets forth the general qualifications of jurors, providing that a person must, inter alia, "(5) Not . . . have been convicted of a felony for which he has not been pardoned." The trial court found that Mr. Akins had been qualified to serve as a juror because of his first-offender pardon. La. R.S. 15:572 provides that a person pardoned as a first offender "has all rights of citizenship and franchise." Defendant fails to show that the trial court erred in finding that Mr. Akins was qualified to serve as a juror, and properly denied his motion for a new trial as to that ground.
Defendant additionally argues on appeal that he was denied his right to fully and fairly conduct voir dire and exercise his peremptory challenges and challenges for cause because he did not know of Mr. Akins' prior conviction. Defense counsel admitted in his motion that he did not ask prospective jurors about their criminal history. Therefore, defendant was not denied the right to ask Mr. Akins if he had a criminal history. Defendant submits in his brief on appeal that having Mr. Akins on the jury prejudiced him and violated his right to fair trial. However, defense counsel stated at the hearing on the motion for new trial that Mr. Akins had been convicted of committing an aggravated burglary involving a female wherein he entered a residence armed with a knife. One would think that someone in defendant's position, charged with murdering a female with a knife during the commission of an aggravated burglary, could only hope for a juror such as Mr. Akins. Defendant fails to show that he was prejudiced by having Mr. Akins on his jury.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 10
Defendant next argues that the trial court erred in denying his motion for *779 continuance that he submits was made on Friday, September 21, 2001, three days before trial was to commence. The record does not reflect that defendant filed any motion to continue the September 24, 2001 trial date. A minute entry from September 21, 2001 states that the State filed a motion to continue on that date. The record contains a written motion for continuance filed by the State on Friday, September 21, 2001, based on the unavailability of witnesses Det. Gilds and George Weber who were out of town, and a third witness who was believed to be out of the country. The transcript of the September 21, 2001 hearing shows that after the State argued its case, the trial court denied the motion. At that point Defense counsel stated: "[M]ay I put something on the record." Defense counsel represented that he had been in a second-degree murder trial for two weeks, that he had just gotten out of trial at 2:00 a.m. that same morning, and said that "if anybody should move for a continuance, I should be moving for one out of exhaustion." The court then stated again that it was denying the motion for continuance. Defense counsel said he understood the court's ruling. At no point did defense counsel object to the ruling by the trial court.
It does not appear that defense counsel moved for a continuance. Rather, it appears that defense counsel went on the record to oppose the State's motion for continuance. In any case, even if defense counsel did request a continuance based on exhaustion, and even if the trial court denied it, there was no error in the trial court's ruling.
In State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, the court stated:
As a general matter, the decision to grant or deny a motion for continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb a trial court's determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Strickland, 94-0025, p. 23 (La.11/1/96), 683 So.2d 218, 229; State v. Bourque, 622 So.2d 198, 224 (La.1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16. Whether a refusal to grant a continuance was justified depends on the circumstances of the particular case presented. State v. Bourque, 622 So.2d at 224; State v. Simpson, 403 So.2d 1214, 1216 (La.1981). Generally, this court declines to reverse convictions for improper denial of a motion to continue absent a showing of specific prejudice. State v. Strickland, 94-0025 at p. 23, 683 So.2d at 229; State v. Gaskin, 412 So.2d 1007, 1011 (La.1982).
98-1078 at p. 22, 750 So.2d at 849.
Defendant's sole argument on appeal as to the purported denial of his motion for continuance is that he was prejudiced because of the fatigue of his counsel, "which may have lead to the jury not accepting his manslaughter defense." This is only speculation as to specific prejudice. The denial of the motion for continuance, if there was one, was made on a Friday, three days before the Monday start of trial. Under these circumstances, it cannot be said that a denial of a motion for continuance on the ground of defense counsel's exhaustion would have constituted reversible error.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 11
In his final assignment of error, defendant claims that the cumulative effect of the errors denied defendant a fair trial. As to any harmless errors, the Louisiana Supreme Court has held that the cumulative effect of harmless errors does not warrant reversal of a conviction or sentence. State v. Strickland, 94-0025, pp. *780 51-52 (La.11/1/96), 683 So.2d 218, 239; see also State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 155.
In this assignment of error defendant also cites what he claims were errors in addition to the errors specified in the ten earlier assignments of error. First, he submits that the State "tired" to give notice of the death penalty aggravating circumstances the day after voir dire. Defendant was not sentenced to death, and he shows no prejudice as to this claim. Defendant next claims that the State referred in its opening statement to Officer Delery, who would be a witness, having sat with the jury during voir dire. Defendant claims this was done to give the officer additional credibility. Defendant failed to object to this, and thus failed to preserve the claim of error for review. La.C.Cr.P. art. 841(A) (a defendant cannot avail himself of an alleged error unless it was objected to at the time of occurrence). Lastly, defendant argues that the State was improperly permitted to call the victim's mother, Elizabeth J. McPherson, during the guilt phase of the trial to present victim impact testimony. While defense counsel offered to stipulate to anything the State wanted with respect to the brief testimony of Ms. McPherson, at no point was there an objection as to her testimony during the guilt phase of trial. Thus, defendant failed to preserve this claim of error for review.
There is no merit to this assignment of error.

CONCLUSION
Accordingly, for the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED
NOTES
[1] State v. Jones, unpub., 99-1393 (La.App. 4 Cir. 6/30/99) (adequate remedy on appeal); State v. Jones, unpub. (La.App. 4 Cir. 1/31/00), writ denied, XXXX-XXXX (La.4/20/00), 760 So.2d 1157.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).